IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| SEIRUS INNOVATIVE ACCESSORIES, INC., a Utah corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>DO-GREE FASHIONS, LTD., a Canadian corporation,<br><br>    Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:05-CV-355<br><br>Judge Dee Benson |

      Plaintiff Seirus Innovative Accessories, Inc. brought this action against Defendant Do-Gree Fashions, Ltd. alleging that Defendant has infringed and misrepresented its source of goods, namely ski masks, which is the subject matter protected by Plaintiff's patents.  In its Complaint, Plaintiff states that not only are the ski masks which it sells protected patents, but they are also protected trade dress, both of which Defendant has infringed.  On February 15, 2008, the Court held a *Markman* hearing and heard argument by the parties on claim construction issues as well as Defendant's Motion for Partial Summary Judgment that Trade Dress is Not Protectable.

## I.  Background

      Both Plaintiff and Defendant are in the business of designing and selling ski accessories. Plaintiff owns four patents on face protective products, U.S. Patent Nos. 4,300,240 ("'240 Patent"), 4,825,474 ("'474 Patent"), 5,214,804 ("'804 Patent"), and 6,272,690 ("'690 Patent"). The '804 Patent comprises a face mask that can be used for winter sport activities, such as skiing, skating or biking.  The face mask includes a mask member covering a user's face and a

scarf member covering the neck.  The mask member is made of a closed-cell neoprene with a fleece interior lining and a Lycra exterior, and the scarf member is made of a fleece material.  Although similar to the '804 Patent, the '690 Patent includes a fleece hood-like head member so that the mask covers a user's entire head and face, except for the opening made for the eyes.  In its Complaint, Plaintiff alleges that these two patents have been infringed by Defendant.  As a result, it is necessary that the Court construe the disputed terms within the claims of the '804 Patent and the '690 Patent.

## II.  Claim Construction

Claim construction is a matter of law.  "[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history."  *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The terms within the claims must be given their ordinary and customary meaning according to a person of ordinary skill in the art at the time of the invention.  *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*).  The claim term should be read "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.*  In fact, the specification "is the single best guide to the meaning of a disputed term."  *Id.* at 1315 (quoting *Vitronics,* 90 F.3d at 1582).  Finally, the prosecution history of the patent, which contains the complete record before the Patent and Trademark Office, should be considered and is "often of critical significance" when construing the claims.  *Vitronics,* 90 F.3d at 1582.

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.  In such circumstances, it is improper to rely on extrinsic evidence."  *Id.* at 1583.  Extrinsic evidence may be considered, however, if it "shed[s] useful light on the

relevant art." *Phillips,* 415 F.3d at 1317.  Nonetheless, the intrinsic record is always the primary source for a court to consider when construing the terms within the claims of a patent.

**A.     '804 Patent**

   **1.     "Scarf Member"**

Claims 1 and 4 of the '804 Patent include identical language relating to the scarf member: "a scarf member secured to said mask member along said lower edge, said scarf member being sized to extend from said lower edge substantially the height of the neck of the user and in width rearwardly about the neck on both sides of the head . . . ."  '804 Patent.

The dispute here is over what area the "scarf member" covers.  The specification repeats what is stated in the claims by explaining that the scarf member extends from the lower edge of the mask member "substantially the height of the neck."  '804 Patent at 3:41-42; 4:6-7.  Plaintiff argues the phrase "'substantially the height of the neck' means that the scarf member extends *downwards* from the lower edge of the mask member," and "makes no comment as to whether the scarf member extends *upwards*."  Plaintiff's Reply, pg. 7.  Plaintiff contends there is no limitation on the height of the scarf member, referring to the statement in the specification that "the scarf member may extend to under the ear 37 or over the ear 37."  '804 Patent at 4:13-14.  Thus, Plaintiff argues that there is "no language that limits the height of the scarf member upwards towards the crown of the user's head rearward of the temple area."  Plaintiff's Opening Brief, pg. 10.

In contrast, Defendant points to language in the claims stating that "said upper edge [of the mask member] extends rearwardly to the area of the temples, and wherein said lower edge [of the mask member] is arcuate and intersects said upper edge in the area of the temples."  '804 Patent at 7:32-35; *see also id.* at 6:63-66.  Also, the specification states that to the extent the

height of the scarf member extends beyond the upper edge, it "has an additional height 50 so that the scarf member 14 extends essentially between contact with the shoulder area 46 upwardly to proximate the middle of the user's ears." *Id.* at 4:9-12.  "Nowhere does the specification describe a hood-like member that covers the top of a user's head . . . ." Defendant's Opening Brief, pg. 6.

The Court finds that the sections of the '804 Patent cited by Defendant support Defendant's proposed construction that the scarf member is limited to an area below the temples. Because the lower edge of the mask member intersects the upper edge of the mask member in the area of the temples, one of ordinary skill in the art would understand that the scarf member is sized to cover only the neck and lower head below the temples.  The construction that the Court adopts for the term "scarf member" is:

> **an article of clothing for protecting the neck in adverse weather which is secured to the lower edge of the mask member, extending no higher than the user's temples, which extends from the lower edge of the mask substantially the height of the neck.**

**2.     "Securing Means"**

The scarf member includes a "securing means," which is included in Claims 1 and 4: "securing means associated with said scarf member to secure the article of clothing about the head of a user . . . ." '804 Patent.  The parties agree that "securing means" is a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6, encompassing "a function to be performed rather than definite structure or materials for performing that function." *Chiuminatta Concrete Concepts, Inv. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1307 (Fed. Cir. 1998).  Furthermore, the parties agree that the function associated with "securing means" is "securing the article of clothing about the head of the user."  Therefore, the Court need only identify the structure that corresponds to the agreed upon function.  *See Cardiac Pacemakers, Inc. v. St. Jude Medical,*

*Inc.,* 296 F.3d 1106, 1113 (Fed. Cir. 2002) (explaining that when construing a means-plus-function limitation, the court must first identify the function and then determine what the disclosed structure is).

Under 35 U.S.C. § 112, ¶ 6, a patentee is allowed to claim an apparatus for performing a function without expressing all of the possible means of accomplishing that function. However, such limitations do not cover all possible means for accomplishing the function, but rather are limited to those structures disclosed in the specification. Even then, the "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history *clearly links* or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.,* 124 F.3d 1419, 1424 (Fed. Cir. 1997) (emphasis added). "[A]lthough it is indeed true as a general proposition that multiple structures *can* perform the single claimed function, this is so only where the claim language permits, and only where the specification clearly identifies corresponding structures." *Cardiac Pacemakers,* 296 F.3d at 1117. If a patent applicant fails to adequately disclose corresponding structure, "the applicant has in effect failed to particularly point out and distinctly claim the invention . . . ." *Id.* at 1425 (citing *In re Donaldson Co.,* 16 F.3d 1189, 1195 (Fed. Cir. 1994)).

The pertinent portion of the specification states that "[a]lthough a variety of snaps, strings or other fastening devices may be used, the embodiment here illustrated employs VELCRO . . . ." '804 Patent at 4:60-62. VELCRO is described as a "hook and pile structure" that is "sized in height and in width to provide adjustability for the user." *Id.* at 4:64-66. Accordingly, Defendant argues that the corresponding structure is limited to snaps, strings, and "hook and pile" devices, such as VELCRO. Plaintiff argues, however, that the corresponding structure covers "any arrangement" for securing the left and right sides of the scarf member to each other,

including stitching.  In support of this argument, Plaintiff points out that snaps do not allow the user to adjust the fit of the clothing; similarly, one having ordinary skill in the art would recognize that stitching the left and right portions of the scarf member serves the same function as snapping together the ends of the scarf member.

While no one disagrees that stitching serves essentially the same purpose as snaps, Plaintiff's argument has its own loose ends.  Plaintiff fails to recognize that the structure corresponding to the function must be disclosed in the specification and clearly linked to the stated function.  Stitching is disclosed in the specification, but only when describing how the mask member is attached to the scarf member, not how the scarf member ends are secured to each other.

> To secure the scarf member 14 to the mask member 12, the outside or front 102 of the scarf member 14 is positioned on the front 104 of the mask member 12. The ends 106 and 108 are positioned proximate each other or in general alignment. The securement is then effected by *stitching* the ends 106 and 108 together with thread 110.

'804 Patent at 3:17-23.  In the second paragraph of the third column, stitching is the sole method disclosed for attaching the scarf and mask member to each other.  Yet, when the specification describes the means used for attaching the ends of the scarf member together, alternative structures are disclosed and stitching is omitted.  Therefore, one skilled in the art would understand that stitching is disclosed in the specification, but clearly *not* linked to the function of securing the scarf member about the head of the user.

Similarly, Plaintiff's argument that "other fastening devices" encompasses alternative means, i.e., "any arrangement" including stitching, is erroneous.  Again, the structure in a means-plus-function limitation must be disclosed; there is no disclosure of any structure at all in "other fastening devices."  *See Cardiac Pacemakers,* 296 F.3d at 1117 (requiring that the

specification clearly identify corresponding structures).  This generic phrase is too imprecise and lacks specificity; therefore, the Court construes "securing means" to mean:

> **snaps, strings, and "hook and pile" devices, such as VELCRO.**

B.   **'690 Patent**

   1.   **"Sport Goggles For Positioning"**

The language of claim 1 requires "sport goggles for positioning over the eyes of a user, said sport goggles having a height, a width."  '690 Patent.  The parties' primary dispute is over whether "for positioning" requires that the sport goggles be placed over the eyes of the user.  Prior to addressing this issue, however, the Court will address whether "sport goggles" encompasses sunglasses.

Defendant argues that "sport goggles" indicates a specific type of eyewear that is protective in nature to shield one's eyes, particularly in sport activities.  The specification supports this.  "That is, the sport goggles 80 typically have at least an upper edge portion to rest upon the forehead of the user."  *Id.* at 5:46-48.  Goggles are protective in nature because of its lens and the frame that rests upon the forehead, extends over the bridge of the nose, and covers the perimeter of the eye area.  One skilled in the art would understand that the plain meaning of goggles does not include sunglasses.  The Court concludes that "sport goggles" does not include sunglasses.

Next, the Court will address whether "for positioning" means that the sport goggles must be placed over the eyes of the user, as Defendant argues, or whether "for positioning" means that the goggles "are positionable or capable of being positioned."  The difference between the parties' proposed constructions is significant.  According to Plaintiff, the '690 Patent encompasses a ski mask and goggles that are merely *available* for use or are *capable* of being

positioned over the mask.

The Court finds that the prosecution history is critical here.  When Plaintiff originally prosecuted the '690 Patent, the claims included a mask member and a head member *without* goggles.  Yet those claims were rejected by the PTO as obvious over the prior art.  The examiner's rejection was upheld on appeal to the Board.  Plaintiff subsequently added more limitations, including Claim 24, a "combination" of protective clothing and sport goggles: "1. *A combination of a sport goggle and an article of protective clothing* comprising: sport goggles for positioning over the eyes of a user, said sport goggles having a height, a width and means for holding said sport goggles about the head of a user . . . ."  '690 Patent (emphasis added).  Because of the new added limitation, the '690 Patent was issued.

In addition to the prosecution history, the claim language itself – "sport goggles for positioning" – indicates that sport goggles are actually a required part of the invention, not merely an option.  The fact that the language is there at all is worthy of consideration.  Moreover, the Court finds that the way in which sport goggles and clothing are represented as "a combination" does not mean that sport goggles are simply available or capable of being worn.  If this were true, then the inclusion of "sport goggles" would be superfluous.  In essence, any article of clothing is "capable" of being worn; i.e., one who wears the mask is of course free to wear a ski hat on top of the head member portion of the mask, but any inclusion of a "hat" need not be included in the claims of the patent.

Although the Court understands that it was likely Plaintiff's intent that goggles were an option under the '690 Patent, the plain language of the claims and the prosecution history makes it clear that sport goggles must be placed over the eyes of the user.  Were the Court to construe the claim any other way, then the Court would be defining the scope of the claims the same way

in which the claims were represented to the PTO and Appeal Board, who already determined that such a patent was invalid and obvious over the prior art. Therefore "sport goggles for positioning" excludes sunglasses and:

> **the sport goggles must be placed over the eyes of the user.**

### III. Defendant's Motion for Partial Summary Judgment that Seirus' Trade Dress Is Not Protectable

Plaintiff is also seeking trade dress protection for its face protection products. However, Defendant argues in its motion for partial summary judgment that Plaintiff's trade dress is functional, and therefore not protectable as trade dress under the Lanham Act or state law. Defendant points to the expired '204 Patent and statements made by Plaintiff in its interrogatory answer concerning the scope of the trade as evidence of the trade dress's functionality. The Court, however, finds there exist genuine issues of material fact regarding the trade dress issue. Defendant's motion for partial summary judgment is therefore DENIED.

### IV. Plaintiff's Motion for Leave to File Excess Pages

On the day that the parties' reply briefs on claim construction issues were due, Plaintiff filed an overlength brief at the same time it filed the Motion for Leave to File Excess Pages. Although Defendant filed a response, it did not oppose the motion. Accordingly, the Court hereby GRANTS the motion.

IT IS SO ORDERED.

DATED this 26th day of February, 2008.

_____
Dee Benson
United States District Judge